Filed 6/16/16  P. v. Zarate CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL ZARATE,<br><br>        Defendant and Appellant. | A142428<br><br>(Contra Costa County<br>Super. Ct. No.<br>51302876) |

**INTRODUCTION**

Jensy Romero and defendant Rafael Zarate dated for about a year before she finally broke up with him in August 2011.  About a month later, Romero was dead, stabbed to death by defendant, who admitted at trial that he killed her.  Defendant appeals his conviction of first degree murder and stalking for which he was sentenced to 29 years to life in prison.  He contends that his murder conviction must be reversed because there was insufficient evidence to support a conviction based on felony murder, one of two alterative theories of first degree murder presented to the jury, the other being premeditated murder.  He also contends that his four-year sentence for stalking must be stayed under Penal Code[1] section 654.  We reject these arguments and affirm.

---

[1]  All statutory references are to the Penal Code unless otherwise stated.

## FACTUAL AND PROCEDURAL BACKGROUND

*Stalking*

When Jensy Romero broke up with defendant in August 2011, he was "desperate" to get her back and "obsessed" with her. He called her cell phone sometimes 50 or 60 or 70 times in a day. Beginning around September 10 there was an increase in phone calls from defendant, though Romero rarely if ever called defendant.[2] On September 16 alone, defendant called Romero 134 times; she called him once. He began following her "all the time." He parked in front of the apartment complex where she lived, waiting for her to leave or to come home from work. He rang her doorbell incessantly, sometimes 20 times in two minutes, and demanded to speak with her. Defendant was unrelenting, despite Romero's efforts to get him to leave her alone. She would not answer the door and told her family not to let him in, she stopped texting him, hung up on his phone calls, and told him to get away from her when she saw him.

Romero could not keep defendant away from Angie's, a restaurant in Richmond where she worked as a waitress. Defendant started showing up at Angie's almost every day, and insisted that she serve him. She refused, and told a coworker not to serve him either. But defendant kept appearing at Angie's; he would bring in his own bottle of water and just sit there.

In the weeks leading up to Romero's stabbing, she told many people that she was afraid of defendant and that he threatened her. On September 8, defendant sent her a text message that said, "[b]eautiful baby, don't you believe that you are going to be responsible for a tragedy? You are going to regret it; but it will be too late." Romero told one of her sisters that she was going to get a restraining order and that "[i]f it wasn't going to be her, it would be the kids." She told the sister that defendant told her "that if he couldn't have her, no one would."

---

[2] On September 10, defendant called Romero 17 times; on September 11, 54 calls; on September 12, 42 calls; on September 13, 88 calls; on September 14, 23 calls; on September 15, 69 calls; on September 16, 133 calls; on September 17, 71 calls; on September 18, 56 calls; on September 19, 51 calls; on September 20, 16 calls.

The threats and menace escalated in the last week of Romero's life. On one occasion, defendant was at Angie's restaurant while Romero and one of her sisters were working there. Defendant wanted Romero to leave the restaurant with him. When she refused, he became angry and aggressive, and grabbed and pulled her. Romero's sister tried to get involved, but defendant pushed her away. As defendant was struggling with Romero he threatened that "he was going to kill [Romero]; and that if she wasn't going to be for him, she was not going to be for anyone else." Romero eventually relented and went with defendant, but appeared frightened and scared.

Later in the last week of her life, Romero saw defendant waiting for her near the parking lot of her apartment complex. She was so frightened and worried about defendant following her that she asked her sister Sandra Romero to keep driving and to take her to Los Compadres, a nearby restaurant where another sister was working. When Romero got to Los Compadres, she hid in the large walk-in refrigerator. Defendant came looking for her, and although Romero's sister said she wasn't there, defendant searched the entire restaurant, including the back of the restaurant and the bathroom. He finally left, but parked his car across the street, facing the restaurant and watching the front entrance.

Romero called 911 and said it was an emergency and that someone was following her. On the 911 tape that was played for the jury, Romero can be heard saying defendant "follows me wherever I go. I cannot leave my house because he keeps following me. And then he already threatened to kill me. [¶] . . . [¶] . . . He's . . . obsessed and wants to force me to be with him." By the time police arrived at Los Compadres, defendant had left.

Defendant had gone to Romero's apartment and was waiting for her there. When Romero showed up, having just left the restaurant where she had been hiding, defendant insisted on speaking to her. She called 911 again, telling them "I'm the girl that just called," and that defendant was now at her house bothering her and not letting her go into her apartment. Defendant fled.

3

Defendant did manage to get into Romero's apartment, uninvited, a few days before she was murdered. He found her cell phone and searched it for messages. When he saw there were names of people he did not know, he began to suspect that she was dating someone new.

*Murder*

Romero started her work shift at Angie's restaurant on September 20, 2011, around 4:15 p.m., her normal start time was 4:00. Defendant arrived at the restaurant at 4:05 p.m., and sat at the bar drinking a bottle of water. He was wearing tall white cowboy boots; concealed and sheathed in his left boot was a knife with a five or eight-inch blade and a three-inch handle. The sheathed knife was loose in his boot. Defendant looked out the front door of the restaurant several times.

Jesus "Patino" Rojas, Romero's boss, was at Angie's restaurant, along with another customer. Patino left the restaurant about 15 to 25 minutes after Romero arrived. At some point, the other customer left too. This left Romero alone in the restaurant with defendant. She called her boyfriend, Ignacio Gomez, and asked him to come to the restaurant, telling him that defendant "was there" and she did not want to be alone. She promised Gomez she would call back. Gomez thought Romero sounded scared.

Romero ignored defendant's efforts to talk to her. Defendant got angry when Romero called Gomez, because "she was trying to bring somebody and I was not going to be able to talk to her about taking me back." Defendant stood up, grabbed Romero, and pulled her toward the inside of the restaurant. Romero screamed for help and tried to run back out to the bar; defendant hit her in the face and back of her head. He held her by the back of her neck or head, and pulled her toward the women's restroom, which was about 30 feet from the bar. Either Romero broke away from him and ran to the women's bathroom, or she was forcibly pulled there by defendant. The bathroom was in the center of the restaurant, about 60 feet from the front door and 70 feet from the back door.

At some point after Romero was in the bathroom, defendant encountered another customer and walked him out the front door of the restaurant. Hector Bahena, an eye witness who had been sitting in his parked car outside Angie's waiting for his wife, was

4

looking directly into the restaurant. He saw an angry looking man (later identified as defendant) walk outside the restaurant and "look around." Bahena testified that the restaurant customer looked "submissive" and "worried" and "scared," as defendant indicated to him that he should just leave. The customer did walk away, but looked back over his shoulder with concern. Then defendant went back inside Angie's and locked the front door behind him, although it was not closing time.

Romero made another telephone call to Gomez from the bathroom, telling him that defendant "was there." Then Gomez heard Romero yell and the phone call was cut-off. Gomez called her back but could not get through; Defendant had taken Romero's phone.

Defendant then stabbed Romero four times. The fatal stab wound was a six-inch-deep wound on her left upper chest that went straight through Romero's chest cavity and left lung, and pierced her heart and aorta. The stabbing blow was of enough force that it went through a rib. Defendant also stabbed Romero on her left upper chest just below her collarbone, on her left abdomen, and on her lower right breast. Two wounds were horizontal; two were vertical. Romero had injuries to her upper and lower lips consistent with a punch or a slap to the face. She had wounds on her forearm consistent with being grabbed or held tightly, and scratches on the back of her left shoulder that were consistent both with being dragged on a surface, and someone trying to hold a door shut with that part of their shoulder. There was also evidence that Romero had a slightly more than two-inch bruise toward the back and top of her head consistent with blunt force injury by a hand or an object, including being slammed into a wall. It is possible that this caused Romero to lose consciousness or become stunned. She had no "defensive" wounds of the type sustained when someone is resisting an attack, which the forensic pathologist considered "unusual" with the type of injuries that Romero suffered.

After stabbing Romero, defendant wiped the blood off the knife, put the knife back in his boot, and left bloody paper towels in the trashcan in the restroom. He threw Romero's cell phone into the kitchen sink under running water.

5

Defendant left the restaurant and bought black shoe polish to cover the blood on his white cowboy boots. He drove his truck to Oakland, and left it there. He told his daughter he was giving her his truck, and told her where to find it. He told his son to "never go away from God." He stayed overnight at his nephew's house, showered and watched a movie and went to sleep.

Meanwhile, Patino returned to Angie's at about 6:15 p.m. that evening. The restaurant was locked and the lights were off, even though it wasn't closing time. He opened the door to the bathroom and found Romero's dead body. Her cell phone was in the kitchen sink under running water.

The next day, when police arrived at defendant's nephew's house to arrest him, defendant armed himself and barricaded himself inside the house. After a 13 or 14-hour standoff, SWAT officers shot and arrested defendant.

*Jury Trial and Sentence*

Defendant was charged by way of information with the murder of Jensy Romero (§ 187; count 1) and stalking (§ 646.9, subd. (a); count 2). As to count 1, it was alleged under section 12022, subdivision (b)(1) that defendant personally used a deadly weapon, a knife. After a jury trial, defendant was found guilty as charged and the personal use allegation was found true.

The trial court imposed a sentence of 29 years: 25 years to life for the murder count, plus one year for the personal use finding, and the upper term of three years on the stalking count, to be served consecutively.

**DISCUSSION**

I. *Sufficiency of the Evidence*

The trial court instructed the jury on two theories of first degree murder: 1. premeditated and deliberate murder and 2. felony murder, on the theory that defendant killed Romero during the commission of a burglary, having entered the restaurant or the

bathroom with the intent to falsely imprison her.[3]  Defendant contends that the murder conviction must be reversed because there was insufficient evidence to support a conviction on the felony murder theory, and no indication as to which theory the jury verdict was based on.  The Attorney General responds that there was sufficient evidence to support a conviction on either theory.

A.  *Standard of Review*

In *People v. Guiton* (1993) 4 Cal.4th 1116 (*Guiton*), our Supreme Court addressed the issue of the supportability of a conviction where two theories were given to the jury and only one of them was supported by substantial evidence.  In *Guiton*, a defendant was charged and convicted of the felony of selling or transporting cocaine.  The jury was informed that they could find defendant guilty of this count if they found either that he had sold cocaine or that he had transported it.  The Court of Appeal reversed the conviction on the grounds that there was insufficient evidence to support a finding that the defendant had sold cocaine on the day in question, and it could not determine from the record on which basis the jury reached its verdict.  Our Supreme Court granted review to consider whether reversal was proper where sufficient evidence existed that defendant transported cocaine.  (*Id.* at p. 1119.)  The Attorney General in *Guiton* did not contend that there was sufficient evidence to support the conviction on both theories, but argued that since there was substantial evidence supporting the alternate ground of transporting cocaine, the conviction should be affirmed.  (*Id.* at p. 1121.)

The Supreme Court agreed, and announced this general rule:  "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative

---

[3]  The trial court instructed the jury that "[t]he defendant has been prosecuted for first degree murder under two theories:  (1) the murder was willful, deliberate and premeditated and (2) Felony Murder. . . . [¶] Each theory of murder has different requirements, and I will instruct you on both.  [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder.  But all of you do not need to agree on the same theory."

7

indication in the record that the verdict actually did rest on the inadequate ground."[4] (*Guiton, supra,* 4 Cal.4th at p. 1129.) In so ruling, our high court adopted the U.S. Supreme Court's reasoning in *Griffin v. United States* (1991) 502 U.S. 46 (*Griffin*). (*Guiton, supra,* 4 Cal.4th at pp. 1126-1127.)

"[A]lthough affirmance is the norm, reversal might be necessary if the record affirmatively demonstrates there was prejudice, that is, if it shows that the jury did in fact rely on the unsupported ground. . . . [W]e will not *assume* prejudice, but the record may show it. . . . We may, for example, hypothesize a case in which the district attorney stressed only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground. In that case, we might well find prejudice. The prejudice would not be assumed, but affirmatively demonstrated." (*Guiton, supra,* 4 Cal.4th at p. 1129.) The errors are state law errors, subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Guiton*, *supra*, 4 Cal.4th at p. 1130; accord *People v. Perez* (2005) 35 Cal.4th 1219. 1232-1233.)

On the facts in *Guiton*, our Supreme Court concluded the conviction should not have been reversed by the Court of Appeal. Although there was insufficient evidence to support a finding that the defendant had sold cocaine, this was a "purely factual" question that the jury was "as well equipped as any court to analyze the evidence and to reach a rational conclusion. The jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory.' (*Griffin*, *supra*, 502 U.S. at p. [59].) Thus the *Griffin* rule generally requiring affirmance applies." (*Guiton*, *supra*, 4 Cal.4th at p. 1131.) Although the district attorney at Guiton's trial

---

[4] Our Supreme Court in *Guiton* went on to contrast another situation—not applicable here—where the inadequacy of proof is "legal, not merely factual, that is, when the facts do not state a crime under the applicable statute," referring to an earlier decision in *People v. Green* (1980) 27 Cal.3d 1 (*Green*). In such an instance, "the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129.)

argued to the jury briefly that defendant was guilty of selling cocaine, he "concentrated" on the transportation theory.[5] Nor did "the record affirmatively demonstrate a reasonable probability that the jury found the defendant guilty solely on the sale theory." (*Ibid*.)

In the matter before us, defendant does not argue that the jury instructions were legally deficient, or that the theory of felony murder argued to the jury was incorrect as a matter of law. Defendant's argument about the inadequacy of proof is purely factual. Thus, we review the record for sufficiency of the evidence to support a verdict for felony murder. If we find sufficient evidence, our inquiry ends. Even if we cannot find sufficient evidence to support a conviction on the theory of felony murder, if there is sufficient evidence to support a conviction on the basis of first degree premeditated murder, the conviction stands unless the record affirmatively demonstrates the jury relied on the unsupported ground. [6]

As we will discuss, the evidence was sufficient to support a felony murder verdict. Even if it was not, there is sufficient evidence to support a conviction based on first degree premeditated murder, and there is nothing in the record to demonstrate the jury relied on an unsupported ground in reaching that verdict. Consequently, any error (if indeed there was any) in instructing the jury on felony murder was harmless, and the conviction on count 1 for first degree murder stands.

B. *Sufficiency of the Evidence Standard*

The standard of review for a claim for sufficiency of the evidence is a familiar one: "[w]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[5] The district attorney in *Guiton* told the jury that the " 'easiest . . . [theory] in this case to agree upon, I should think, would be transportation; that the defendant transported the cocaine.' " (*Guiton*, *supra*, 4 Cal.4th at p. 1131.)

[6] Defendant's briefs avoid addressing the legal inadequacy versus factual inadequacy distinction, despite the fact that the cases he relies on clearly make this distinction. (See, e.g., *People v.* Perez*, supra,* 35 Cal.4th at p. 1233 ["The nature of this harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory"].)

elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

        C.  *Applicable Law of Felony Murder, Burglary and False Imprisonment*

        " 'The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.' ([*People v.*] *Chun*[ (2009)] 45 Cal.4th [1172,] 1182 [(*Chun*)].)  'Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed.  If the felony is listed in section 189, the murder is of the first degree; if not, the murder is of the second degree.  [Citations.]  Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony.  [Citation.]' (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654, italics omitted; see *Chun,* at p. 1182.)" (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)  "[T]he killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing." (*People v. Proctor* (1992) 4 Cal.4th 499, 532 (*Proctor*).)  Circumstantial evidence may support a felony murder conviction, including to establish the defendant's intent. (*People v. Prince* (2007) 40 Cal.4th 1179, 1259-1260.)  Thus, for example, when the underlying felony is burglary with felonious intent to commit a crime, "such intent usually must be inferred from all the facts and circumstances revealed by the

10

evidence, because only rarely can it be proved directly." (*Proctor*, *supra*, 4 Cal.4th at p. 533 [finding sufficient evidence of requisite felonious intent in felony murder based upon burglary with intent to commit rape].)

Burglary is one of the felonies listed in section 189, and it is the basis of the felony murder theory in this case. Any person who enters a building or room within that building with the intent to commit a felony is guilty of burglary. (§ 459.) To prove felony false imprisonment (the intended felony under the theory in this case), the prosecution must prove a defendant intentionally confined or detained a person by violence or menace, and made the other person stay or go somewhere against that person's will. (§§ 236 and 237; CALCRIM No. 1240.) Violence means a " 'the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint.' " (*People v. Babich* (1993) 14 Cal.App.4th 801, 806, italics omitted.) " 'Menace is a threat of harm express or implied by words or act.' " (*People v. Islas* (2012) 210 Cal.App.4th 116, 122.)

D. *Substantial Evidence Supports the Felony Murder Conviction*

The prosecution's felony murder theory was that defendant murdered Romero during the commission of a burglary. The burglary occurred either when he entered Angie's restaurant or when he entered the bathroom at the restaurant with the intent to commit false imprisonment by force or menace.

We note at the outset that this was not the prosecution's primary theory of murder. Almost all of the prosecution's closing argument on the murder count (which runs to about 40 pages of transcript in total) was devoted to the theory of premeditated and deliberate murder, and felony murder was never mentioned at all in the rebuttal closing argument. When the prosecutor did address felony murder, she described it initially as "another theory," and her explanation of its elements took up about a page and a half of transcript. It was not until well into the closing argument that she argued the felony murder theory, and all of this in about two pages of transcript. Defense counsel was completely dismissive of the felony murder theory in closing argument, giving it short shrift and calling it a "fallback theory," a "backstop in case [the prosecution] can't prove

11

first degree murder," and "just a distraction" based on a version of facts that even the prosecutor did not believe happened.

Nonetheless, there was enough evidence to sustain a finding on a felony murder theory that defendant entered the restaurant or the bathroom intending to detain Romero by force or threat of harm.

In the last week of Romero's life, defendant used violence or threatened violence to force her to come with him or to detain her. At Angie's restaurant, he had angrily grabbed and pulled Romero when she would not leave the restaurant with him, and pushed her sister away in the process; he also threatened to kill Romero. And later that week, after Romero came out of hiding from the walk-in refrigerator at Los Compadres restaurant, defendant was waiting outside of Romero's apartment and would not let her go back in until she called 911. On the day Romero was killed, defendant was once again sitting at the bar of Angie's restaurant with his bottled water, in what had become his characteristic lurking behavior, but this time turning and looking outside the front door several times. Angie's was the only place he could have access to her, because she had no choice but to be in the same place with defendant when she was at work, and defendant, by his own admission, was "obsessed" with her and "desperate" that she had spurned him. Defendant told the jury he went to Angie's restaurant on the day of the murder to "convince her to take me back." There was substantial evidence for the jury to infer that defendant was at Angie's restaurant with the intent to forcefully detain Romero.

Defendant's own testimony about what happened on the day of the murder provides substantial evidence of violence and menace. When Romero called her boyfriend for help, defendant grabbed her phone so that she would listen to him. Defendant grabbed Romero's hair when she ran away from him so that she would "sit down and talk" to him. He grabbed her because he knew she was running to the bathroom to get away from him. When Romero was in the bathroom, in defendant's own words, she "tried to run out, and I closed the door" to keep her inside. Again in his own words, when Romero "walked from that wall to the other wall [of the bathroom] because

12

she was trying to get out," he stood by the door and she could not get out of the bathroom past him.

Defendant contends there is no evidence that when he entered the restaurant or the bathroom he had the specific intent to confine Romero, although that is what may in fact have happened; and that even if he entered for a felonious purpose, there is no evidence that the purpose was for false imprisonment. Defendant also argues that nothing in his conduct after entering the restaurant is indicative of his intent to commit false imprisonment; he simply "sat at the bar, had a bottle of water, and conversed with Romero." Then his "subsequent conduct was assaultive and homicidal, and not with the specific intent to falsely imprison." Reviewing the whole record in the light most favorable to the judgment, these arguments are not persuasive, and the jury was entitled to reject them and resolve conflicting inferences in favor of the evidence we described above supporting a finding of specific intent.

Nor are we persuaded by defendant's parsing of the prosecution's remarks about felony murder. Defendant argues that in closing argument "[t]he inference the prosecutor wants the jury to draw is that appellant made two entries into the bathroom," but the "prosecution's *evidence*—in contrast to the prosecutor's argument—shows only one entry into the bathroom." Defendant's vague contention that it is "likely" the prosecution's argument on this point had a "powerful influence on the jury" is unsupported by the record.[7] The prosecution's arguments, as the jury was instructed,

---

[7] Defendant's citation to *People v. Pitts* (1990) 223 Cal.App.3d 606, 694 (*Pitts*) in support of the point that a prosecutor's "closing argument is an especially critical period of trial" and that it carries "great weight" is of no applicability here. At issue in *Pitts* was egregious and prejudicial prosecutorial misconduct during closing argument and throughout the trial that resulted in a reversal on appeal, described in detail in an opinion that runs to almost 300 pages. There is no suggestion in the matter before us of any prosecutorial misconduct in closing argument, nor were there any objections by defense counsel to the portion of the closing argument dealing with felony murder.

13

were not evidence, and the "theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)[8]

Because we conclude there was sufficient evidence to support a conviction based on felony murder, our review of the murder conviction can stop here. But even if we were to conclude that the evidence was not sufficient, we still would not reverse the murder conviction because, as we discuss below, there was substantial evidence to support a finding of premeditated and deliberate first degree murder, the other theory before the jury.

E. *Substantial Evidence Supports the Murder Conviction on the Theory of Premeditation and Deliberation*

We next turn to the sufficiency of the evidence to support the first degree murder conviction on the theory of premeditation and deliberation. Even if the evidence was not sufficient to support a felony murder conviction, the evidence of premeditation and deliberation was more than sufficient.

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ["willful, deliberate and premeditated killing" as first degree murder].) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] ' " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 824.) To prove a killing was " 'deliberate and premeditated,' " it is "not . . . necessary to

---

[8] The prosecutor's closing argument regarding felony murder was not particularly clear, perhaps because part of her argument was based on defendant's testimony, which she suggested she did not believe. (Referring to the bathroom, she argued, "Clearly he was false imprisoning her in this very very small space. Then, according to his testimony, it's during that time she says something that doesn't agree with him. And at the moment he kills her so. I don't—obviously by what I have argued—believe that's what happened. [¶] But just in case any of you do, he is still guilty of first degree murder. You also do not have to agree on the theory of first degree murder. You just have to agree that it is first degree murder. . . .")

14

prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the California Supreme Court "identified three factors commonly present in cases of premeditated murder: '(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

Our high court has cautioned that *Anderson* " 'did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' " (*People v. Koontz, supra*, 27 Cal.4th at p. 1081.) Thus, the *Anderson* "factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation. [Citation.] However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

There was substantial evidence that defendant had planned the crime. Only days before, he had threatened to kill Romero. Defendant walked into Angie's restaurant on the day of the murder with a long knife, even though he usually did not carry a weapon,

15

let alone a knife 8 or 11 inches long that was sheathed, concealed and loose in his white cowboy boot. A witness saw defendant seated at the counter, repeatedly looking out the window before the crime was committed, suggesting he was waiting for the right moment. Although the restaurant was open for business, defendant closed and locked the door before killing Romero. Even the steps he took after murdering Romero suggest premeditation and deliberation: he threw her cell phone under running water, he wiped off the murder weapon and disposed of it, and he used black shoe polish to mask the blood on his white boots.[9]

There was overwhelming evidence of motive. Defendant wanted Romero back, and she decidedly wanted nothing more to do with him; she did not want to date him, she was going to stay with her boyfriend, and he believed she was seeing someone else, which made him "jealous" and "furious."

Finally, the manner in which defendant killed Romero is consistent with a finding of deliberation. The fatal blow was so deep and of enough force that it fractured Romero's rib before it went into her chest cavity. Two wounds were horizontal and two wounds were vertical, which could be consistent with defendant holding a knife horizontally and then changing his grip and holding it vertically. (See *People v. Prince, supra,* 40 Cal.4th at p. 1253 [clustered stab wounds support an inference of deliberate killing].) There was also evidence to support the inference that Romero was unconscious or at least stunned when defendant stabbed her to death, in light of the bruise to her head

---

[9] The "jury could reasonably consider [defendant's conduct after the killing] in relation to the manner of killing." (*People v. Perez, supra,* 2 Cal.4th at p. 1128.) In *Perez,* after stabbing the victim, the defendant did not immediately flee the scene and instead searched dressers and jewelry boxes and changed a bandage on his bloody hand. Our high court observed the defendant's conduct "would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing." (*Ibid.*) Likewise in this case, a reasonable jury could take into account defendant's calm behavior after the killing—including later going to his nephew's house, talking to his children, watching a movie, sleeping—and find it inconsistent with a state of mind that would have produced a rash, impulsive killing.

and the unusual lack of defensive injuries, as well as the wounds on her back and wrist that suggest defendant dragged Romero to the place she was murdered.

We conclude that there was sufficient evidence to sustain a first degree murder conviction on the theory of premeditated and deliberate murder, and, as we have already discussed, sufficient evidence to sustain the murder conviction on a felony murder theory. But to close the loop, even if we had only found evidence to sustain the conviction on a premeditated and deliberate murder theory, we would still affirm the conviction. We go back to our Supreme Court's analysis in *Guiton*, and look to see whether the "record affirmatively demonstrates there was prejudice, that is, if it shows that the jury did in fact rely on the unsupported ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129.)

We find no such prejudice. Defendant contends that the error was not harmless because the prosecutor clearly emphasized and strenuously argued the felony murder theory. As we have discussed, these assertions are completely contradicted in the record. The prosecution did not emphasize the felony murder theory of murder in her closing argument, and did not address it at all in her rebuttal argument, even though defense counsel mentioned it in his closing, if only to dismiss its viability. The jury did not ask questions about the jury instructions or the application of the law to the evidence, let alone the felony murder theory.[10] If in fact there was error in giving the felony murder instruction at all, and we find there was not, we conclude that the jury's " 'own intelligence and expertise . . . save[d] them from' the error of giving them 'the option of relying upon a factually inadequate theory.' (*Griffin*, *supra*, 502 U.S. at p. [59].)" (*Guiton*, *supra*, 4 Cal.4th at p. 1131.) The trial court instructed them that they were the sole judges of the evidence; that "some of these instructions may not apply depending on your findings about the facts of the case," and that "[a]fter [they] have decided what the

---

[10] The jury requested to hear the 911 tapes again and to have the testimony of Maria Murillo read back to them. Murillo was one of Romero's coworkers at Angie's restaurant, and her preliminary hearing testimony was read at trial. They also requested to hear defendant's testimony, which was read to them before they reached a verdict. The jury did not ask any substantive questions about the facts, law, or instructions.

17

facts are," they should "follow the instructions that apply to the facts as [they] find them." If there had been any error, it was harmless.

Premised on the unsupported statement that the prosecution emphasized the felony murder theory, defendant posits that the jury, who had been instructed on voluntary manslaughter "could readily have found appellant guilty of first degree murder even if it had determined that he did not premeditate, but acted in the heat of passion." But defendant's argument, with its faulty premise, cannot stand because it is no more than a mere assertion, and, in a mention meriting only a footnote, that it was "supported by substantial evidence." This unelaborated statement is insufficient to allow us to imply prejudice.

II.    *Penal Code Section 654*

Defendant was convicted in count 2 of stalking Romero from September 10, 2011 through September 20, 2011.[11] The trial court sentenced him to a three-year sentence, to run consecutive to the sentence on the murder conviction. Defendant contends for the first time on appeal that the trial court erred in imposing this sentence, because section 654 required that any sentence on count 2 be stayed.

Section 654 provides, in part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

" '[S]ection 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute

---

[11]    Both parties' arguments on the application of section 654 assume the relevant period of conduct for stalking was from September 10 through September 20. We note that at the outset of the trial, immediately before opening statements, the jury was instructed that the information alleged that the stalking was alleged to have occurred "[o]n or about September 20, 2011." When jury instructions were being settled after the close of evidence and outside the presence of the jury, the prosecution made an oral motion to amend count 2, the stalking charge, to read "[o]n or about September 10th, 2011 through September 20th, 2011." The motion was granted without objection.

but nevertheless constituted an indivisible transaction.  [Citation.] . . . [Citation.]  If all the offenses were *incident to one objective,* the defendant may be punished for any *one* of such offenses but not for more than one.'  (*People v. Perez* (1979) 23 Cal.3d 545, 551, italics added.)  'If [a] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' "  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  The application of section 654, thus, 'turns on the *defendant's* objective in violating' multiple statutory provisions.  (*People v. Britt* (2004) 32 Cal.4th 944, 952 (*Britt* ).)  Where the commission of one offense is merely ' "a means toward the objective of the commission of the other," ' section 654 prohibits separate punishments for the two offenses.  (*Britt,* at p. 953.)"  (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1288.)

Further, if a course of conduct is divisible in time, even though it is directed to one objective, the statute may not apply; this will depend on "the intent and objective" of the actor.  (*People v. Correa* (2012) 54 Cal.4th 331, 336; *People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)  "[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm."  (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.)

Whether section 654 applies is a decision for the trial court, who is given "broad latitude in making this determination."  (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626 (*Tarris*).)  We uphold the trial court's findings if there is any substantial evidence to support them.  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312 (*Hutchins*).)  A court may make express findings, or the findings may be implied from the court's ruling.  Here, where there was no reference at all to section 654, "the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective."  (*Tarris*, *supra*, 180 Cal.App.4th at p. 626.)  We " ' "view the evidence in a light most favorable to the respondent and presume in

support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Hutchins*, *supra*, 90 Cal.App.4th at pp. 1312-1313.)

Defendant argues on appeal that section 654 applies because Romero was killed during the course of the stalking on September 20, and when defendant acted on that date it was incident to one objective: killing Romero. Noting correctly that stalking under section 646.9 is defined as a crime involving a "course of conduct,"[12] he thus contends that "as a matter of law, the stalking and the murder committed during the course of that stalking constitute an indivisible and continuous course of conduct" with the single objective. Defendant tries to bolster his argument with a statement made by the prosecution, outside the presence of the jury and, as we discuss, out of context, that Romero was killed during the course of stalking on September 20.

The Attorney General views it differently: counts 1 and 2 were both divisible in time and undertaken by defendant with distinct objectives. The stalking under section 646.9 occurred before September 20, and consisted of repeated and incessant calls and texts; threats of harm; and attempts to contact Romero at her home and at the restaurant, including gaining uninvited access to her house and cell phone on September 18, and the assault on Romero at Angie's when he grabbed her and pushed away her sister. The objective of murdering Romero marked a shift, which the prosecutor argued to the jury occurred around September 18 when defendant searched Romero's cell phone, became convinced she was seeing someone else, and concluded that "he was not going to get her back." On this date Romero sent text messages to his daughters with his address, for them to keep "just in case," stating "I miss you and I love you and I always will."

_____

[12] Under section 646.9, subdivision (a), one of the elements of stalking is that the defendant "willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person." For purposes of section 646.9, "harasses" is defined as engaging in "a knowing and willful *course of conduct* directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (*Id*. subd. (e), emphasis added.) And "*course of conduct*" is defined as "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (*Id*. subd. (f), emphasis added.)

The Attorney General also argues that even if there was a single objective for both crimes, they were committed on separate occasions. Defendant had time to reflect between the time he got access to Romero's home and cell phone on September 18, and her murder on September 20, and section 654 should not apply.

We conclude that substantial evidence supports the trial court's sentencing decision in the context of all of the evidence in the case. It is important to remember that defendant had confessed to killing Romero, and his counsel's main focus in closing was to argue against a finding of premeditation and deliberation, not that defendant should be acquitted of stalking, which he as much admitted.[13]

The phone records beginning on September 10 showing dozens of daily calls (see fn. 2, *ante*), and the frightening incidents where defendant followed Romero, showed up at her home and work, threatened her, and caused her fear: this was a course of criminal conduct that the trial judge reasonably could have found had an objective different from murder, and warranted the imposition of separate punishment. The trial judge could also have reasonably concluded that there was sufficient evidence of a course of conduct

---

[13] In discussing second degree murder, defense counsel told the jury, "I will concede, Ladies and Gentlemen, that this is probably the Prosecution's best argument for what really happened here. But that's what this crime may look like to you. And that's what Mr. Zarate described, that he intended to kill Ms. Romero in that moment, that this was an intentional killing, without premeditation or deliberation, but intentional." Counsel then went on to discuss voluntary manslaughter.

As for stalking, defense counsel stated, "Every time that he goes to call her or reach out to her, he wants to talk to her. And, oh, look Ladies and Gentlemen, *it's misguided; its stalking her; it's inappropriate; it's wrong.* But that doesn't mean he intended or premeditated and deliberated about killing her on that particular day." (Emphasis added.) Later, referring to "the texts and the number of phone calls" by which defendant harassed Romero, defense counsel characterized them as "*the* acts—the *illegal acts I concede and admit*—of a desperate person" who was "insanely jealous and won't let go." (Emphasis added.)

comprising stalking that was proven to have occurred by September 18, days before the murder.[14]

Because the trial court imposed separate and consecutive sentences, we infer that it was satisfied that defendant acted with separate objectives when he committed the stalking and the murder, and that he committed those crimes on separate occasions. The evidence supports this conclusion and there is no ground to stay the sentence on count 2.

## DISPOSITION

The judgment is affirmed.

---

[14] Defendant's assertion in his opening brief that the prosecution agreed that the stalking was incidental to the murder is not persuasive. This comment, made outside the presence of the jury, was in the context of discussing a potential felony murder theory that was later withdrawn, and never argued to the jury. Nor are we persuaded by defendant's argument that neither the jury nor the trial court ever stated which acts constituted the stalking. Defendant cites no authority that they were asked or required to make that determination.

_____
Miller, J.

We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.


A142428, *People v. Zarate*